## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Derek Dunn, a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, being duly sworn, do depose and state as follows:

### INTRODUCTION

1.     I am investigating the offenses of distribution and possession of child pornography via the peer-to-peer ("P2P") Network BitTorrent, which has been occurring using the IP address associated with the Steele Hill Resort located at 516 Steele Hill Road, Sanbornton, New Hampshire.  As will be shown below, there is probable cause to believe that Timothy Ryan ("RYAN"), an employee who also resides on the resort, has committed the offenses of distribution and possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2), and 2252A(a)(5)(B).  I submit this affidavit in support of a warrant under Rule 41 of the Federal Rules of Criminal Procedure to seize and search the person of RYAN and his assigned bedroom on the resort ("the SUBJECT PREMISES"), which are further described in Attachment A and incorporated herein by reference, for evidence, fruits, and instrumentalities of the forgoing criminal violations.  I specifically request authority to search RYAN and the SUBJECT PREMISES for any computer and computer media located therein where the items specified in Attachment B, incorporated herein by reference, may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of criminal activity.

2.     This affidavit is based in part on information that I learned from discussions with other law enforcement officers and on my own investigation of this matter.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I

believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of 18 U.S.C. §§ 2252A(a)(2) and 2252A(a)(5)(B), are presently located on RYAN and within the SUBJECT PREMISES

## AGENT BACKGROUND

3.      I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, and have been so employed since April 2003. I am currently assigned to the Manchester, New Hampshire field office. As part of my regular duties as an agent, I investigate criminal violations relating to a broad range of immigration and customs related statutes, including those relating to child exploitation and child pornography. I have received training in the area of child pornography and child exploitation, and as part of my duties have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. §2256) in various forms of media, including digital/computer media. I have conducted investigations and executed search warrants involving child exploitation and child pornography offenses.

4.      I am a "Federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

## SPECIFIED FEDERAL OFFENSES

5.      Title 18, United States Code, Section 2252 prohibits a person from knowingly possessing or accessing sexually explicit images of a minor with the intent to view them as well as transporting, receiving, distributing or possessing in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of a minor engaging in sexually explicit conduct.

## **DEFINITIONS**

6.      The following definitions apply to this affidavit and Attachment B:

a.)      "Child pornography" includes any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct where (A) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (B) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (C) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.  18 U.S.C. § 2256(8).

b.)      "Child Erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, legally obscene or that do not necessarily depict minors in sexually explicit conduct.

c.)      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.  See 18 U.S.C. § 2256(2).

d.)      "Minor" means any person under the age of eighteen years.  See 18 U.S.C. § 2256(1).

e.)      "Chat" refers to any kind of communication over the Internet that offers a real-time transmission of text messages from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

f.)      "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1) as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."  These devices include but are not limited to any data-processing hardware (such as central processing units, memory typewriters, mobile "smart" telephones, tablets, and self-contained "laptop" or "notebook" computers).

g.) "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h.) "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i.) The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j.) "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

k.) "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address which is used each time the computer

accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

l.)    The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON PEER-TO-PEER ("P2P") SOFTWARE

7.    Peer-to-peer ("P2P") file-sharing is a method of communication available to Internet users through the use of special software such as BitTorrent. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. These P2P networks are commonly referred to as decentralized networks because each user of the network is able to distribute information and queries directly through other users of the network, rather than relying on a central server to act as an indexing agent, where all of the information is first deposited before it is distributed. A user first obtains the P2P software, which can be downloaded from the Internet. In general, P2P software allows the user to set up files on a computer to be shared with others running compatible P2P software. However, only files that are specifically stored in shared folders are exchanged. Therefore, a user needs simply to move a file from one folder to another to stop the distribution across the Internet. Further, once a file or files are placed in a shared folder its distribution is dependent only on the machine being turned on and connected to the Internet.

8.      BitTorrent is one type of P2P file-sharing protocol. Users of the BitTorrent network wishing to share new content will use a BitTorrent client to create a "torrent" file for the file or group of files they wish to share. A torrent file is a small file that contains information about the file(s) and provides a method for a user to download the file(s) referenced in the torrent from other BitTorrent users. Torrent files are typically found as the result of keyword searches on Internet sites that host or link to them. Torrent files may be referenced by their "infohash", which uniquely identifies the torrent based on the file(s) associated with the torrent file. To download file(s) from other users on the BitTorrent network, a user typically obtains a torrent file. The BitTorrent software processes the information in the torrent file and locates devices on the BitTorrent network sharing all or parts of the actual file(s) being sought. The download of the content referenced in the torrent is achieved after the requesting computer and the sharing computer(s) directly connect to each other through the Internet using the BitTorrent software.

9.      One of the advantages of P2P file-sharing is that multiple files may be downloaded at the same time. In addition, a user may download parts of one file from more than one source computer at a time. For example, a BitTorrent user downloading a movie file may actually receive parts of the movie from multiple computers. The advantage of this is that it speeds up the time it takes to download the file. It is possible to also download the file or files from only one computer.

10.     The BitTorrent Network bases all of its file shares on the Secure Hash Algorithm (SHA1). This mathematical algorithm allows for the digital fingerprinting of data. Once you check a file or files with a SHA1 hashing utility capable of generating this SHA1 value (the fingerprint), that will be a fixed-length unique identifier for that file. The SHA1 hash is the current Federal Information Processing and Digital Signature Algorithm. The SHA1 is secure

because it is computationally infeasible for two files with different content to have the same SHA1 hash value.

**<u>PROBABLE CAUSE</u>**

11.    This investigation focuses on an individual sharing child sexual abuse material ("CSAM") on the BitTorrent Network from an IP address associated with the Steele Hill Resort, located at 516 Steele Hill Road in Sanbornton, New Hampshire. The software used by law enforcement uses SHA1 hash values to identify files being shared on the network that have been previously determined to contain child pornography and/or related material. When the software recognizes the SHA1 hash value of such files on the network, it automatically tries to download them. Further, the BitTorrent software used by law enforcement uses a single-source download protocol. In other words, when the software identifies a BitTorrent user that has suspected files of child pornography available for download, it will initiate a download of the entire file from that single user, as opposed to downloading portions of the target file from multiple users.

12.    In 2020, Deputy Frederick James of the Grafton County Sheriff's Department observed that the IP address 64.223.67.220 was a top offender in New Hampshire for supplying CSAM through the P2P network BitTorrent. In fact, observations made from various BitTorrent indices, which provide publicly available information and are used as matchmakers to connect users on the BitTorrent network, revealed that this IP address had consistently been used to distribute CSAM on the BitTorrent network since May 2015.

13.    Deputy James observed that Taunton (MA) Police Detective Randy Demello had obtained downloads on April 3, 2020, from the IP address 64.233.67.220 and contacted him to obtain the downloads. Deputy James reviewed Detective Demello's downloads and observed that several of the files were CSAM. In response to a Summons, Consolidated Communications

identified that the subscriber for IP address 64.233.67.220 at the time of the download was Steele Hill Resort at 516 Steele Hill Road, Sanbornton, NH.  The investigation revealed the address 516 Steel Hill Road is the Administrative Business Office for the resort. The resort is a destination family resort in Sanbornton, NH that specializes in year-round weddings and time share retreats. The resort is surrounded by woods, overlooks the lakes and mountains of New Hampshire, has a nine-hole golf course, indoor and outdoor pools, hiking trails, tennis courts and conference venues. Below is an aerial view from Google Maps.



14.     Between 2020 and 2022, Deputy James and other investigators continued to occasionally review the BitTorrent software and continued to observe downloads from the IP address 64.223.67.220.  Deputy James conducted research on the resort but could not establish a suspect due to the large number of employees and guests who would likely have access to the

internet at the resort. Given the duration of the P2P activity resolving to the resort as well as the times of day and night that the activity was observed, investigators surmised that the suspect was almost certainly an employee of the resort and likely someone who resided on the property.

15.　　In June 2022, HSI Task Force Officer Adam Rayho began furthering the investigation. TFO Rayho and Nashua (NH) Police Detective Peter LaRoche maintained an undercover ("UC") BitTorrent software at the Nashua Police Department. As mentioned above, the software focuses on users sharing child sexual abuse material on the BitTorrent Network. Upon reviewing downloads obtained for the months of April, May, and June 2022, TFO Rayho observed fifteen from the IP address 64.223.67.220 on different dates and times. On each of these occasions, the UC software recognized and downloaded files of investigative interest containing CSAM from the IP address. TFO Rayho reviewed each connection to include the files which had been downloaded, and observed the majority contained CSAM and others contained child erotica. A selection of three successful downloads and the related files are outlined in the following paragraphs.

16.　　On April 29, 2022 at 02:40:24 UTC, the UC BitTorrent software identified a torrent of investigative interest that was available for download from the IP address 64.223.67.220. The SHA1 info hash associated with the torrent was one that had been previously determined to contain CSAM. The UC BitTorrent software connected with the target IP address and successfully downloaded fourteen complete files. One of the downloaded files is described as:

Filename:　　45f0a0c9afcde99d6addbe21991a83a8 - 10yo anal bondage cumshot girl man pthc vaginal.avi

Description:　two minute and one second video of a prepubescent female lying on her back with her legs tied at the ankles. An adult male is continually inserting his penis into the prepubescent females vaginal and anal openings while

also occasionally inserting his finger into her vaginal opening. At the conclusion of the video, the male ejaculates on the prepubescent female's stomach.

17.     On May 29, 2022 at approximately 12:17:08 UTC, the UC BitTorrent software identified a torrent of investigative interest that was available for download from the IP address 64.223.67.220. The SHA1 info hash associated with the torrent was one that had been previously determined to contain CSAM. The UC BitTorrent software connected with the target IP address and successfully downloaded twenty-nine complete files. One of the downloaded files is described as:

Filename:     2012_Rosemary_March_2012_BJ_CUM_SDC10676.avi

Description:   forty-seven second video of a naked prepubescent female lying on her side. An adult male is inserting his penis into the prepubescent female's mouth and eventually ejaculates on the prepubescent female's chest.

18.     On June 02, 2022 at approximately 01:44:28 UTC, the UC BitTorrent software identified a torrent of investigative interest that was available for download from the IP address 64.223.67.220. The SHA1 info hash associated with the torrent was one that had been previously determined to contain CSAM. The UC BitTorrent software connected with the target IP address and successfully downloaded two-hundred and fourteen complete files. One of the downloaded files is described as:

Filename:     (pthc buratino lolifuck) alena - girl in bed gets wanked over (cumshot) - new 2012.wmv

Description:   seven second video of an adult male masturbating over a naked, sleeping, prepubescent female.

19.     In June 2022, TFO Rayho sought updated subscriber information for the IP address 64.233.67.220 for the period April 29, 2022 to June 16, 2022. In response to a summons, Consolidated Communications identified the subscriber for IP address 64.233.67.220

during that timeframe was The Summit Resort, with a service address of 516 Steele Hill Road, Sanbornton, New Hampshire. Consolidated Communications advised the service start date was September 27, 2013 and provided an account number which matched the account for the previous legal process issued by Deputy James in 2020 for the IP address 64.233.67.220.

20. Researching The Summit Resort, TFO Rayho learned it had a physical address in Laconia, New Hampshire and appeared to be associated with Steele Hill Resort based on its website. Contact was later made with representatives of the Steele Hill Resort who advised The Summit Resort is a sister company of Steele Hill Resort and is owned under the same parent company. TFO Rayho subsequently contacted Consolidated Communications who advised the company name for the internet account has changed on occasion but that the physical location/service address of the IP address 64.233.67.220 has remained 516 Steele Hill Road, Sanbornton, New Hampshire, which is the Steele Hill Resort.

21. During the month of July 2022, TFO Rayho continued to monitor the UC BitTorrent software and observed an additional thirteen downloads from the IP address 64.233.67.220. One of the successful downloads and related files is described in the following paragraph.

22. On July 13, 2022 at approximately 14:44:45 UTC, the UC BitTorrent software identified a torrent of investigative interest that was available for download from the IP address 64.223.67.220. The SHA1 info hash associated with the torrent was one that had been previously determined to contain CSAM. The UC BitTorrent software connected with the target IP address and successfully downloaded 2,121 complete files. One of the downloaded files is described as:

Filename:    Kait_5Yo_Golden_Shower_On_Dad.wmv

Description:    five minute and twenty-three second video involving a naked
                prepubescent female and adult male. The prepubescent female first
                performs oral sex on the adult male's penis and stimulates the male's penis
                with her hands. As the video continues, the prepubescent female sits on
                the male's lap near his penis while the male masturbates.

23.     During August and September of 2022, TFO Rayho continued to monitor the UC

BitTorrent software and observed downloads of investigative interest similar to the ones

referenced above which contain CSAM from the IP address 64.223.67.220.

24.     On September 21, 2022, TFO Rayho, Special Agent Shawn Serra, and I made

contact with one of the Steele Hill Resort owners (SHRO) and informed him that an individual(s)

had been using the resort's internet and IP address to obtain and distribute CSAM for the past

several years going back to May 2015.  SHRO advised that he was willing to assist law

enforcement in attempting to identify the individual(s) responsible for this activity.[1]  Through

subsequent communications with SHRO, the resort's legal counsel, and outside contractors who

maintain the resort's information technology (IT) network, law enforcement learned that IP

address 64.223.67.220 has five subnetworks that are part of the wireless internet infrastructure at

the resort, some being password protected and others being open networks available to anyone

on the property.  Given the size of the resort, numerous wireless access points (WAP) are located

throughout the property to help ensure that wireless internet service is widely available

throughout the property.  Connections to this IP address via any of the five wireless networks

must be made from devices physically located on the resort property.  In addition, due the remote

---

[1] This individual was approached by law enforcement after a review of his international travel
records, which showed that he was out of the country on the dates of some of the illicit activity
occurring at the resort.  Based on this information, law enforcement considered this individual an
unlikely suspect.

location of the resort, a device would not be able to connect to the resort's wireless network from any of the neighboring properties.

25.     Based on the information above, the number of years the activity has consistently been observed, and the varying hours of the day and week when activity has been observed, your Affiant suspects that there is one individual responsible for the majority, if not all, of the activity and that this individual has resided on resort property since at least May 2015.  In response to legal process, the resort provided information regarding current employees of the resort who have been employed by the resort and resided on the property since on or before May 2015. According to the resort's response, there are only two current employees who meet those criteria—they are Timothy RYAN and D.O.

26.     According to resort records, D.O. was hired by the resort in April 2001 and began residing on the property in or about September 2010.  Timothy RYAN began working at the property through a job placement agency and submitted a signed employment application with the resort on April 30, 2015.  RYAN worked on the resort property first as an employee of the job placement agency beginning on or about May 17, 2015.  RYAN then became an employee of the resort on or about May 27, 2015.  It is unclear when RYAN moved onto the resort property, but he signed a housing agreement dated May 28, 2015.  The timeline associated with the start of RYAN's employment at the resort correlates closely with the start of the BitTorrent activity resolving to the resort's IP address.  Both RYAN and D.O. reside in the "Main Inn Building" on the resort property, with RYAN residing in a private room on the third floor and D.O. residing in a private room on the second floor.

27.     In effort to identity the device(s) that were connecting to the resort's wireless network to access and distribute CSAM, representatives of the resort consented to law

enforcement monitoring and capturing network traffic information that is transmitted over the resort's wireless network with assigned IP address 64.223.67.220. The network traffic information that law enforcement was authorized to monitor is information that is accessible to the resort and the resort's IT staff.

28.    On November 4, 2022, U.S. Secret Service New England Cyber Fraud Task Force (NECFTF) TFO Sergey Vasilyev, HSI Special Agent Jordan Lawi, and I met with representatives of the Steele Hill Resort. TFO Vasilyev set up equipment to monitor and capture network traffic information during the investigation. Capturing network traffic is done by using a computer program to create packet capture files (PCAP). "Packets" are data travelling through a network. Some of this data—specifically, the Media Access or "MAC"[2] address—identifies the specific devices that are connected to the wireless network at a given time. The network traffic information may also identify the particular wireless access point on the property that a particular device is using to access the wireless network.

29.    On multiple occasions in November and December 2022, while remotely monitoring network traffic, TFO Vasilyev observed activity on the resort's wireless network that indicated a user of the network was actively using P2P software.

30.    On November 14, 2022, at approximately 0815 hours, TFO Vasilyev observed that a device with the MAC address AE:7C:E3:9A:1E:7D was using the resort's wireless network to transmit via the BitTorrent protocol a torrent file with a SHA-1 info hash known by law enforcement to contain CSAM. The firewall logs showed that the device name associated with this P2P network activity was \"Tim-s-Galaxy-A50\". TFO Vasilyev further identified that

---

[2] A MAC address is a unique identifier associated with an electronic device capable of connecting to a network.

at the time of this activity, the device was connected to a wireless access point that is located in the "Main Inn Building" where RYAN resides.

31.     On December 5, 2022, TFO Vasilyev reviewed network traffic logs that showed that \"Tim-s-Galaxy-A50\" with MAC 70:1f:3c:5d:61:79 was active on BitTorrent at approximately 0640 hours and was connected to AP47, which is a wireless access point in the "Main Inn Building" where RYAN resides.  The network logs did not show a torrent info hash.

32.     On December 7, 2022 from approximately 21:10 to 22:47 hours, TFO Vasilyev observed that a device with the MAC address 70:1f:3c:5d:61:79 was using the resort's wireless network to transmit via the BitTorrent protocol a torrent file with a SHA-1 info hash known by law enforcement to contain CSAM.  The firewall logs showed that the device name associated with this P2P network activity was \"Tim-s-Galaxy-A50\".  TFO Vasilyev further identified that during the timeframe associated with this activity, the device connected to several wireless access points on the resort property, including access points located in the "Main Inn Building" where RYAN resides.

33.     Based on the observation of two distinct MAC addresses, both with the host/device name \"Tim-s-Galaxy-A50\", being associated with P2P activity on the resort's wireless network, TFO Vasilyev believes its likely that RYAN is using at least two different devices to connect to the resort's wireless network.

**BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY**

34.     Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers, computer technology, and the Internet

have revolutionized the manner in which child pornography is produced, possessed, distributed, and stored.

35.    Computers basically serve five functions in connection with child pornography: production, communication, distribution, storage, and social networking. With digital cameras, images of child pornography can be taken with or transferred directly onto a computer. In addition, the use of commercially available software and devices also allows for the conversion and transfer of other forms of visual media into various digital and electronic media formats. A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to millions of computers around the world.

36.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. This is also true for portable electronic devices like cell phones and tablets.

37.    The Internet affords individuals several different venues for meeting and communicating with each other; and obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. The Internet is also used as a means for child sexual exploitation offenders to solicit potential victims through the use of various online services to include, but not limited to, online profiles, email, instant messaging, and chat.

38.    As with most digital technology, communications made from a computer are often saved or stored on that computer. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in

"bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP (Internet Service Provider) client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces in a computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows whether a computer contains P2P software, when the computer was sharing files, and some of the files that were uploaded or downloaded. Computer files or remnants of files can be recovered months or years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a home computer or portable electronic device, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

39.     File transfers and online connections occur to and from IP (Internet Protocol) addresses. These addresses are unique to particular computers during online sessions. An IP address identifies the location of the computer with which the address is associated, making it possible for data to be transferred between computers.

40.     Third-party software is available to identify the IP address of a particular computer during an online session. Such software monitors and logs Internet and local network traffic. It is possible to identify the person associated with a particular IP address through Internet Service Provider records. ISPs maintain records of the IP addresses used by the individuals or businesses that obtain Internet connection service through the ISP. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

41.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following two reasons:

a.)     Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Additionally, when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data that is available in order to determine whether it is included in the warrant that authorizes the search. This sorting process can take days, weeks, or months, depending on the volume of data stored, and is generally difficult to accomplish fully on-site.

b.)     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

42.     In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

43.     Furthermore, because there is probable cause to believe that the computer and its storage devices are all instrumentalities of crimes, within the meaning of 18 U.S.C. Sections 1470 and 2252, they should all be seized as such.

**COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

44.     As described above and in Attachment B, this application seeks permission to search and seize certain records that might be found at the SUBJECT PREMISES and/or on the person of RYAN. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure and search of any computers, cellular telephones, tablets, computer equipment, computer storage

media and electronic storage media found during the course of said searches, and potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

45. I submit that if a computer or other electronic storage medium is found on the SUBJECT PREMISES and/or on the person of RYAN, there is probable cause to believe those records will be stored on that computer or electronic storage medium, for at least the following reasons:

a.) Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, that is, in space on the storage medium that is not currently being used by an active file, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.) Wholly apart from user-generated files, computer storage media, in particular, computers' internal hard drives, contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating systems or application operations, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.) Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

e.) Your Affiant is also aware, through training and experience, that digital storage devices have become interconnected, making it easy for even casual users of technology to transfer or copy images from one device to another, or to maintain duplicate copies on more than one device or storage medium. In fact, many devices such as smartphones can be set to automatically back up

their contents to alternate storage facilities, such as laptop or desktop computers, another phone, photo-sharing websites, and cloud storage providers.

f.) Your Affiant is aware that the contents of smart phones can be synched with or backed up to other digital devices in a variety of ways. Smartphones can be connected through cables to other devices, such as laptop computers, for data transfer. Smartphones can also connect to other devices and transfer photos or documents wirelessly through technology such as Bluetooth. Data can also be sent from the phone to an email account via the Internet, and subsequently downloaded from the Internet to a different device (such as a tablet, game system, or computer) for storage. In addition, many smartphones utilize "cloud" storage. Cellular telephones can be set to automatically back up their contents to user accounts hosted on servers of various cloud storage providers. Users can also opt to perform a back-up manually, on an as-needed basis. Your Affiant is aware that some smartphones also back up their contents automatically to devices such as laptop computers. Additionally, cellular telephones can exchange data between two differing cellular communications devices and other types of electronic and media storage devices via Bluetooth or wireless, regardless of the type of operating system or platform being utilized to operate each of the electronic devices. In addition, media cards which contain many forms of data can be interchanged between multiple types of electronic devices, including but not limited to, different cellular telephones.

## CHARACTERISTICS OF CHILD PORNOGRAPHY OFFENDERS

46. As set forth above, probable cause exists to believe that RYAN has distributed, received, and/or possessed child pornography. Based upon my knowledge and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals involved in such crimes:

a.) Those who distribute, receive, and/or possess child pornography, or who attempt to commit these crimes may collect sexually explicit or suggestive materials, in a variety of media. Such individuals often times use these materials for their own sexual arousal and gratification.

b.) Those who distribute, receive, and/or possess child pornography, or who attempt to commit these crimes often possess and maintain copies of child

pornography material, in the privacy and security of their home or some other secure location.

c.)     Those who distribute, receive, and/or possess child pornography, or who attempt to commit these crimes often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. They often maintain these collections for several years and keep them close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

d.)     Those who distribute, receive, and/or possess child pornography, or who attempt to commit these crimes also may correspond with and/or meet others to share information and materials; they rarely destroy correspondence from other child pornography distributors/collectors; they conceal such correspondence as they do their sexually explicit material; and they often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

47.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer on the SUBJECT PREMISES and/or on the person of RYAN and/or located within the SUBJECT PREMISES because:

a.)     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.) Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.) A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.) The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.) Further, in finding evidence of how a computer was used, the purpose of its use, who used it and when, it is sometimes necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

48.    Based on my training and experience I know that much of the media referenced above, which may contain contraband, fruits and evidence of crime, is by its very nature portable. This includes as example but is not limited to extremely compact storage devices such as thumb drives, laptop computers, and smart phones. In my training and experience, I know it is not uncommon for individuals to keep such media in multiple locations within their premises and/or on their person.

49.    Searching storage media for the evidence described in the attachment may require a range of data analysis techniques. In most cases, a thorough search for information stored in

storage media often requires agents to seize most or all electronic storage media and later review the media consistent with the warrant. In lieu of seizure, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.) **The nature of evidence**. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

b.) **The volume of evidence**. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files is evidence or instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.) **Technical requirements**. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its

data onsite. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    d.)    **Variety of forms of electronic media**. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

50.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the hardware, media, or peripherals on-site, the warrant I am applying for would permit officers either to seize or to imagecopy those items that reasonably appear to contain some or all of the evidence described in the warrant, and then later review the seized items or image copies consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC ACCESS TO DEVICES

51.    This warrant seeks authorization for law enforcement to compel RYAN to unlock any devices requiring biometric access subject to seizure pursuant to this warrant. Grounds for this request follow.

52.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

53.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

54.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face". During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

55.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera

detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

56.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

57.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

58.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped

with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

59. In light of the foregoing, and with respect to (1) any device found on the person of RYAN, or (2) any device at/on the SUBJECT PREMISES reasonably believed to be owned, used, or accessed by RYAN, law enforcement personnel seek authorization, during execution of this search warrant, to: (1) press or swipe the fingers (including thumbs) of RYAN to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of RYAN and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of RYAN and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

60. The proposed warrant does not authorize law enforcement to compel that an individual present at the SUBJECT PREMISES state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel an individual present at the SUBJECT PREMISES to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

61. Based on the aforementioned facts and circumstances, your Affiant respectfully submits that there is probable cause to believe that RYAN, who resides at the SUBJECT PREMISES, has violated the Specified Federal Offenses; and that the fruits, evidence, and instrumentalities of the Specified Federal Offenses are likely to be found in the SUBJECT PREMISES and/or on RYAN's person.

62.     Your Affiant, therefore, respectfully requests that a search warrant be issued

authorizing the search of the SUBJECT PREMISES and RYAN's person as listed in Attachment

A and the seizure of the items listed in Attachment B.


/s/ Derek Dunn
Derek Dunn
Special Agent
Homeland Security Investigations

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. P. 41
and affirmed under oath the contents of this affidavit and application.

 /s/ Andrea K. Johnstone
Hon. Andrea K. Johnstone
United States Magistrate Judge
Date: December  12  , 2022

**ATTACHMENT A**

**LOCATIONS AND PERSONS TO BE SEARCHED**

1) The SUBEJCT PREMISES is a private bedroom assigned to Timothy Ryan on the property of the Steele Hill Resort in Sanbornton, NH. The SUBJECT PREMISES is located on the third floor of the "Main Inn Building," a resort building that contains guest rooms and the Hilltop Restaurant. The third floor of this building contains several private bedrooms assigned to resort employees as well as a common living and kitchen area for these employees. The SUBJECT PREMISES is the private bedroom with the number "705" on the exterior of the door which has been identified by resort management as the bedroom assigned to and occupied solely by Timothy Ryan;

2) The person of Timothy Ryan (DOB ███████████); and

3) Any computer, computer media, or electronic media found in any of the above locations.

1.



2.



**ATTACHMENT B**

**ITEMS TO BE SEARCHED AND SEIZED**

The items to be seized includes all information and objects that constitute fruits, contraband, evidence and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) distribution of child pornography and 2252A(a)(5)(B) possession of child pornography, in any form wherever they may be stored or found at the SUBJECT PREMISES or on the person of Timothy Ryan including:

1. Computers[3] or storage medium[4] used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. Evidence of the lack of such malicious software;

   d. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

   e. Evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

   f. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

---

[3] The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

[4] The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, compact discs, memory cards, memory chips, and other magnetic or optical media.

g. Evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. Evidence of the times the COMPUTER was used;

i. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. Records of or information about Internet Protocol addresses used by the COMPUTER;

l. Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. Contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography, child erotica, and other images of children, including photographs, drawings, sketches, fantasy writings, and notes showing an interest in unlawful sexual contact with children, and evidence assistance authorities in identifying any such children;

5. Internet history, including evidence of visits to websites and applications that offer visual depictions of minors engaged in sexually explicit conduct or that offer a platform to communicate with others who are interested in unlawful sexual contact with children, including evidence of P2P file sharing programs including BitTorrent;

6. Correspondence and records regarding engaging in, or enticing others to engage in sexually explicit conduct with minors, including envelopes, letters, mailings, electronic mail, chat logs, electronic messages on messaging applications, books, ledgers, and records of communications with other individuals, including on any child exploitation bulletin boards, chat forums, or organizations;

7. Records, information, and items relating to the occupancy of the SUBJECT PREMISES; and

8. Records, information, and items relating to the ownership or use of computer equipment found, including sales receipts, bills for Internet access, and handwritten notes.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

*Biometric Access*: During the execution of the search of the SUBJECT PREMISES and the person of Timothy Ryan, as described further in Attachment A, law enforcement personnel are authorized to: (1) press or swipe the fingers (including thumbs) of Timothy Ryan to the fingerprint scanner of the devices; (2) hold the devices in front of the face of Timothy Ryan and activate the facial recognition feature; and/or (3) hold the devices in front of the face of Timothy Ryan and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.